I'll announce the case. We have the second case this morning. United States v. Semler, number 19-2319, Mr. Goldberger and Ms. Rue. And then, Mr. Goldberger, how much time would you wish to reserve for rebuttal? Two minutes, please. Whatever, that's fine by me.  Go ahead, whenever you're ready. May it please the court, my name is Peter Goldberger. It's my privilege this morning to represent Emma Semler, who was the defendant below, is the appellant here. Emma Semler was 19 years old and had already been suffering from drug addiction for some four years when her friend, Jenny Wertzler, died after sharing a small supply of heroin that they, along with Emma's 17-year-old sister, had just purchased together. The appeal presents two unresolved questions of statutory construction, which are critical. I think the problem that we have is we have at least a couple of cases, Pignatore, which talks about acts perpetrated in furtherance of a transfer of sales, such as arranging the delivery of drugs in effect. And then also, Figueroa talks about a deliberate choice to use broad language in 841A in connection with the word distribute. How do you address the fact that our court has used broad language in defining that word? Well, the court, of course, doesn't define the word. The word is defined in Section 802 of the statute. And while under some circumstances in a criminal case, I suppose there are circumstances under which you can make a broad application. But ordinarily, the rule, as we know, is one, start with the statutory language and two, apply a strict interpretation. So, however those cases were decided on their facts, we need to start with the statutory language where distribute is defined as one of the kinds of delivery. Pignatore was a drug kingpin, is that correct? I believe so. So, why wasn't what Ms. Semler did the actual or attempted transfer of a controlled substance? Because the statute defines the requirement as transfer and we understand from the model jury instruction on the cases that transfer means transfer of possession. Not transfer of a physical object in every possible sense, but transfer of possession, which is a legal notion. And what the case that we rely on and the principle that we rely on says is that when two people jointly acquire drugs, two or more people jointly acquire drugs by purchase or any other means and come into joint possession, as long as they remain in possession, joint possession of those drugs to the moment of use, there is no distribution between them as long as there is no distribution to anyone else. Those who came into joint possession remain in possession and there is no transfer of possession. It's a simple and direct application of the statutory language. Did that answer? I hope that answered your question, Judge Porter. Yes. So, this is a plain textual analysis and application of a statute. The government's proposal is really shocking in its breadth. There are tens of thousands of people addicted to heroin. Many of them acquire drugs together and then use them together. And to suggest that the prosecutors can pick and choose as they wish any of them and charge them with distribution far beyond any conceivable congressional intent would destroy the distinction between simple possession and distribution or possession with intent to distribute, which is an enormous difference in the statute. The difference between a misdemeanor with a one-year maximum and a felony with a maximum of 20 years just in its most ameliorated state and then any number of aggravations that can take it up to life very easily. Can you go back for a minute and explain why the definition of transfer that you articulated is the one that we should use rather than just a plain meaning definition of transfer that would include a physical transfer? Well, of course, I suppose without a direct object to the verb transfer, there's an ambiguity. Transfer of what? Right? The model jury instruction, which has stood for many, many years, quite plausibly and rightly explains to juries and has explained to juries within our circuit for, I forget exactly how long, but over a decade for sure, that transfer means transfer of possession. The statute refers to transfer of a controlled substance. Yes, but transfer is a word with a connotation, which is different from just moving something from one place to another. And in the context of controlled substances, it is completely reasonable to resolve that ambiguity as transfer of possession of the controlled substance. I don't think it's a rewrite of the statute. It's a completely reasonable interpretation of the statute. Isn't probably what you're looking for is that there be a jury instruction that allows a jury to differentiate between trafficking or a commercial purpose for the buying of the drugs and the use of the drugs versus a personal use situation? In other words, the type of instruction that Judge Prater refused to give. Yes, yes. Although I, you know, I'm not going to go too far and the statute doesn't require that every trans distribution be commercial. I mean, I couldn't say that. There are distributions from one person to another for use between two people that are not already in joint possession. That would involve a transfer of possession. A transfer of possession. What was the reasoning given by Judge Prater as to why she would not give that jury instruction? Well, oddly, the explanation that was given was that there was no reasonable view of the facts that would support the defense theory. I don't think that Judge Prater even said that she thought Swiderski, the Second Circuit case that articulates this most clearly. I don't think she even said that was wrong. She said that it didn't apply on the facts of this case, although it was for the jury to decide whether it applied to the facts of the case if there was any plausible view of the facts sufficient to raise a reasonable doubt. And certainly, I think most quite clearly there was. And so that ruling by Judge Prater on the grounds that was given was quite clearly wrong. Was there any evidence of the amount of drugs involved in this transaction? I think it was in terms of bags. And then, of course, there would be there was laboratory measurement of the remaining. It was what, a $10 bag? Yeah, yeah. One $10 bag? That would be gram. That would be measured in a minute amount. It's a user amount. What was the total amount purchased? I don't recall. It's a small number of bags. I don't think it was even what addicts call a bundle. I don't think it was even that much. Because there's a certain amount which qualifies, in many cases, the amount of drugs to be intent to distribute because the amount is greater than personal use. Sure. It certainly wasn't anywhere near that amount. And in any event, that would be a jury question. That's an inference a jury can draw from quantity to draw the inference of intent to distribute. But this was well below that range. Well, any conceivable application of that rule, yes. The argument of Emma is that she, her sister, and Jenny contributed to and participated in the deal. But Emma knew the drug dealer. She fronted Jenny the money. She gave Jenny the paraphernalia for using the heroin at the KFC restaurant. And May had been the person who made the physical exchange with the drug dealer. And you're saying that, in effect, that's still personal. Yes. And those are all relevant facts. And that's a view the jury could take. But that would disregard that Emma initiated the transaction. Emma asked whether we, Emma, and when Emma, I'm sorry, Jenny initiated the transaction. When Jenny texted Emma earlier in the day, what she asked was whether they together could go and get drugs. Not, this was not, for example, a text saying, do you have anything you could sell me? Or do you have anything you could share with me, for that matter? But do you want to go together to go get some drugs? And Jenny had the transportation. Emma did not. Jenny had the car. Jenny had money, although she lied about it and said she didn't. And there were enough facts. And we learn about how these transactions take place from the testimony of their friend, Dylan, that one person of a group, when the group goes together to get drugs, one person will have the direct personal interaction with the seller, the unnamed seller in West Philadelphia, in this case. But that does not mean that they're not all acquiring the possession together and simultaneously. Again, this would be for the jury. The prosecutor could argue these points, but the question is only whether the evidence was sufficient for a reasonable jury to have a reasonable doubt. This is a core element of the offense. So we're not deciding what's the better view of all the evidence, but whether any jury could have had a reasonable doubt. Any further questions of my colleagues? Could I turn to the second question, or are you suggesting that my time is up? No, no. I lost track of the time. No, the proximate cause issue. You can deal with it now or you can deal with it on rebuttal. It's not going to be our primary issue. Well, let me state quickly then on proximate cause. Obviously, we only get to this if the evidence is sufficient for the prosecutor to have, for the government to have established guilt beyond a reasonable doubt, even without the instruction. The problem there is how do you wrap it around Robinson? Well, because Robinson has been plainly superseded by legal developments on both of its premises. One, we know that despite, contrary to what Robinson says, that the Supreme Court held in Burrage that cause, that the result element is a cause, the result fact is a cause element that the jury has to decide. But didn't the court in Burrage specifically decline to reach the issue of whether a proximate cause instruction should have been given? It did not decide whether the proximate cause should be given. That's right, but it certainly didn't decide against it. But what decided, what Burrage did decide on proximate cause, which overrules or supersedes Robinson in this respect, is that the plain language of the statute, contrary to what Robinson says, the plain language of the statute does not eliminate all traditional legal causation requirements. That is exactly what the holding of Burrage rejected and the entire framework of the analysis by justice. It didn't reach an issue, and Paroline, by the way, included an express proximate cause requirement, unlike 841. That's true. You go back to what the Third Circuit has done. It's got Robinson, and indeed, I think the instruction here was actually pasted from a Third Circuit model jury instruction, was it not? Yes, the one I was referring to earlier. It's the same instruction. And in that respect, I'm sorry, that instruction requires but-for. Sorry, I'm sorry, Judge. No, I just want to say this does not seem to be your stronger argument. It's hard for me to say that Robins is no longer good law. Oh, I think it's very clearly not good law in both of the respects I said. One, it held that this is a mere sentencing adjustment to be made by a preponderance of the evidence by the judge. And second, that the statutory language is clear on its face that there is no showing beyond mechanical result that's required to establish it. Both of those were rejected by Burrage. And the Supreme Court has said in Burrage and Paroline that what Judge Becker said in the concurring opinion in Needle, which is that proximate cause is the ordinary rule when Congress makes one fact the requirement of proving one fact as the result of another in torts and criminal law. And Congress would need to show very rather clearly that it had rejected that rule. When when a rule is implicit in the tradition of criminal law, we don't require that the rule be articulated in the statute. That is not the way criminal statutes are ever have been read for 200 years. We'll get you back on rebuttal. Thank you. Thank you. Ms. Rue. Good morning, Your Honors. May it please the court. Your Honor, Judge Ambrose, you pointed out the specific important facts here in your opening question to Mr. Goldberger. Emma Semler was asked to front drugs. She agreed to front drugs. She was the one who had the contact. She was the one who had the dealer. And she even provided the syringe and the water to mix the drugs with. But the counter counter post that against the Jenny is the one who made the call, initiated the plan, contributed the car, drove the cars at the pickup spot and invested in the deal by asking Emma to front her money. So it seems like they're in this for a joint and simultaneous acquisition of a controlled substance for personal use. Your Honor, respectfully, I disagree. First, I think even if Swiderski applied, it would be wrong. What about. Well, the facts of Weldon seem to be even more on point. Your Honor, Judge Weldon or Judge Posner in Weldon attempts to expand Swiderski beyond what even the Second Circuit did and ultimately rejected in the Wallace case. Weldon actually, ironically, in Weldon, that was a twenty two fifty five case. And in Weldon, the court had the opportunity to simply say this was not distribution. It did not do so. Weldon was a guilty plea. And what the court said is we're going to remand this to decide if your attorney's advice that you should just plead guilty was absolutely beyond the scope of Strickland. And in the hearing where they remanded it, the court concluded, no, the advice was good. So Weldon has no application here. But let's go back to Swiderski, Your Honor. If Swiderski were good law, what does it say? It says that the point of the controlled substance statute is to separate people based on whether they contribute a role in a link in the chain. And the case actually says that on three separate occasions is the person transferring the drugs, supplying a link in the chain of drug abuse. And here there is no question that Emma Semler supplied a link in the chain. And that, Your Honor, is based on the evidence that Semler herself introduced at trial through cross-examination. What if the chain is a joint and simultaneous acquisition of a controlled substance for personal use? Your Honor, in this case, it was not. What is? Forgive me, Your Honor. What is? Your Honor, in this case, what happened is Jenny Wersler What would qualify then? Your Honor, I think the only thing that would actually qualify would be the circumstances of Swiderski itself, where they are buying something as a married or an engaged couple going to a dealer together. And then as that couple having a mixed substance. Here, what we have were individual bags. And Emma Semler, according to the testimony of her sister, was the one who kept possession of those bags. If they walk into that restroom at the KFC and there's a police officer there and they freak out and Jenny Wersler runs, she doesn't have possession of those bags. Emma Semler had possession right up until the time that she handed over possession of those drugs over to Jennifer Wersler and then handed her the needle and the water. Up until then, there were discrete baggies of heroin. Judge Ross' question is, what would be a joint and simultaneous acquisition? I mean, as Judge Posner said, you're not going to have them walking up, the three of them, saying, part of this is mine. Here's my third. Here's my third. Here's my third. And then I want you to just break it up so that we each have a third. I mean, that's not going to happen in the real world. And the problem that I'm having with this case is that when you look at things that, just from a common sense perspective, okay, they go together to get it. Somebody has to walk up. Somebody pays the money. Somebody walks away. But they were all getting it for all three. And, in fact, all three did use something personally. And what they got was not something that would ordinarily be trafficked outside of the personal use. Your Honor, why are we looking at what's convenient for drug dealers? Why are we looking at? What we're looking at is what is convenient for allowing a jury to decide based on a jury instruction which allows the thinking of Swiderski and the thinking of Weldon to be considered by jurors. Your Honor, I submit that under the language of the statute, we should not be doing that. The language of the statute says. What is the statute intended to do? The statute is intended to stop drug trafficking, to stop kingpins distributing drugs through sellers around the community. And. Your Honor, it's intended to do more than that. It is intended, according to Albernaz, to turn the screws more tightly so that every transfer of drugs is a transfer, is distribution. And in the Wallace case, in the Washington case, in the Wright case, in the Wright case, we had someone turn over $20 and say, bring me back some heroin and we'll use it together. And in Wright, the court said no. That is the person who knew the dealer supplied a link in the chain of causation. But here we have all three going together to the dealer. One of them contacting the dealer. We don't know if they all three went to the dealer, but they went together. One of them, we assume, went and obtained the drugs from the dealer. Then they went all together to the restroom at the KFC and started using the drugs all together. Now, that's very different from someone standing on the street corner and selling $10 worth of drugs to a person who comes up and contacts them. And isn't that the latter situation that concerns us the most? That what we're really concerned about the guy on the street corner, we're more concerned about the guy who supplies it to the guy on the street corner. And we're even more concerned about the guy who has the quantity to supply it to various people to spread out on the street corner. So there is a degree of severity that I think is in any exercise of common sense. We've got to consider in reviewing this statute. Your Honor, I think what we should be doing is looking at the plain language of the statute. That's what you've been saying. What do you say to what I just said? Is there any concern about the degree of severity of the different roles played by different people in the purchase and distribution of drugs? Your Honor, I think two things. First, in terms of, are there different roles? Yes. And one of the roles here is that Jennifer Wurstler had been approaching a lot of people to get drugs, according to the testimony at trial. And she failed. And the way that she succeeded is that she knew a girl who knew where to get drugs. And that right there goes back to the question of Emma Semler was a link in the chain. Wurstler, in order to use heroin that night, she had to get drugs, she had to get a needle, and she had to get water. Let's just play it out on another example. You and I want to go buy a car together. I'm going to front you the money. I buy the car. I hand you the keys to the car. Is that a transfer? It's certainly a transfer of the keys you've handed them to me. And if somehow it were illegal to transfer keys, then you have done that. So we both are going to buy a car that we are both going to use. I go pay the money. I front you the money. You owe it to me afterwards. I buy your portion. We buy the car together, and I hand you the keys. You're telling me that's a transfer. It is a transfer of the keys, Your Honor. And if it were illegal to transfer keys, you know, let's make this, it's illegal to drive from, to drive a car from Pennsylvania to New Jersey during a pandemic. If I bring you the car, even though you already owned it, if I bring you the car to your shore house in New Jersey, then even though we jointly possessed the car, you didn't have the ability to use that Pennsylvania car in New Jersey until I brought it to you. It's not a question of who owns it, Your Honor. It's who has access to it at the moment. And if Jennifer Wurstler had walked out of that bathroom before Emma Semler handed her the drugs, she can't use the drugs. It doesn't matter if there's an agreement that she has a partial ownership in it. Can you address Mr. Goldberger's argument that when the statute talks about distribute, deliver, transfer of the controlled substance, what it really means is distribution, delivery, or transfer of possession, legal possession? Yes, Your Honor. I think we have never, I think the point of a statute when Congress goes to this level of detail, and look at the different steps that it took. First, it says distribution. And then it defines distribution as delivery. And then it defines delivery as transfer of the controlled substance. I think those words are plain. And here, until you try to create some argument about joint possession, it is plain here. And I think this court's job under Albernaz, under Burrage, under Robinson, the court's job is to not try to find out what Congress might have meant in terms of its greater scheme, but it's to apply the language as written. But what happens is, when you have a, when you look back at the Prettyman Commission, and it looks as if they're trying, as Judge Roth noted, to have a distinguishing between trafficking, that is commercial use, and personal drug use. Now, maybe that's not exactly the way some people have interpreted the words, but then you get into the situation where the perception is, if something is a one-year misdemeanor, if it's personal use, and this person now has 21 years with a 20 mandatory, it gives the impression that there's overcharging, that there was no attempt to sell this to anyone else, even in Swiderski. The Swiderskis were going to have, possibly, find another buyer. And the court said, well, so what? This was personal. Is there any doubt in anyone's mind that these three young women were using these drugs personally? Your Honor, there is no doubt that they were using it personally, in the sense that Emma Semler, clearly, the reason that she agreed to go with Jenny Wurstler that night is, number one, she could get a better price, because they could get a bundle. And the court in Washington said that alone, the fact that they're improving their financial situation by getting a bulk discount, may be enough to say that there's even a financial motive there. But regardless... But you're talking about bulk. What bulk did they buy? How much did they buy? Your Honor, that is not... How do you qualify an amount of drugs as a bulk? Your Honor, what Dylan Quinn testified to is that when they would go to West Philadelphia, what they would routinely do is to get a bundle. And that they got a better price on a bundle, which was 12 to 14 bags, than they got if they bought individual bags. So, the inference was that they likely bought a bundle, but that is not in the record. Jennifer Wurstler, obviously, couldn't testify to it because she was dead. Sarah Semler didn't remember. And Emma Semler did not testify. So, we do not have evidence in the record of what was actually bought. How much was paid to the dealer to get the drugs? Your Honor, we can't know that for the same reasons. What we know... And I'd like to bring up, Mr. Goldberger has said in his brief, in his reply brief, and again said today at argument, that Jenny Wurstler lied about not having money. That's not true. What we see in the record is not that Jenny Wurstler ever says, I don't have money. She says, can you front me some? Yeah. Whether she did or she didn't, she did say, can you front me? She initiated the plan. She drove the car. But she had somebody else put up the money. Yeah. She had someone else put up the money. So, again... $10 worth? Your Honor, that's what she says, is can you front me $10 worth? Right. And so, when you go back to what Swiderski says, that the purpose under the Prettyman Commission is, what Swiderski said was the whole point is to eliminate people from being a link in the chain of distribution. And Jenny Wurstler was looking for somebody to distribute heroin to her that night. And she failed until she found Emma Semler. And I think applying the plain language of the statute, yes, it's a harsh result. It's a harsh result because Jenny Wurstler ended up dead on the floor. And that's what makes it a 20-year minimum. Not the fact that this is distribution. Ordinarily, this would bring it from a misdemeanor into a 0-20 felony. When we held in Figueroa that the police officer who planted the drugs on the arrested suspect had distributed a controlled substance, were we eliminating a link in the chain of distribution? In that case, Your Honor, what you were doing is you were applying the statute as Congress wrote it, which was to apply it very broadly. And that was what Alberniz said was appropriate because Congress wanted this statute for distribution to be applied as broadly as possible and to keep turning the screws on the distribution chain. So that was a different context because it wasn't supplying it to somebody who was immediately going to use it. But in terms of the breadth of the statute, that was what the Figueroa case held, is that it was to be applied broadly. And certainly, it should be applied according to its own words. And if that ends up being too harsh, that is a policy decision for another branch of government. If it is too harsh, it should be back to Congress. If Jenny gives her packet of drugs back to Emma for a minute and says, hold this while I prepare my syringe, and then Emma gives the drugs back to Jenny, is that a transfer? If we saw that happen on videotape and could prove it, they are. It's silly, but those are transfers back and forth. They meet the definition, transfer of a controlled substance. And a controlled substance, this is not a car. This is not a TV. This is not a hamburger under Weldon. This is a substance that is illegal to possess. And so every time someone transfers it, it's illegal. And we want to discourage people from doing that. And if we have to draw a line somewhere, Your Honors, I submit that we should draw it where Congress drew it. Well, even if we say it was joint possession, they're still subject to punishment, right? If you say it's joint possession, then this is a misdemeanor. Okay. It's the transfer. It is the transfer that is the distribution. Either way, it's illegal. Either way, she will not go unpunished. It is illegal. But, Your Honor, I would ask you, if the concern were joint possession, if somehow that were relevant here, let me talk about suppose you have a kingpin organization. Suppose you have five drug dealers who get together. They go to the DR together. They come back with 100 kilograms of heroin, and they store it in a warehouse in New Jersey. And then one of them goes and gets some of that heroin out and brings it to his friend, another one of the people who'd originally bought it. Well, they've all got constructive possession. They've all had actual possession. They all own those drugs in New Jersey. But when one of them crosses the river and brings it to the other person who had already been in joint possession of it, if we catch him transferring those drugs from New Jersey to Pennsylvania, we are absolutely going to charge him with distribution. Let me say that that's why I was so concerned about the amount of drugs involved in this transaction. Right? Your Honor, and we don't know the full amount of the drugs. We can infer from the record that it was a bundle. Maybe the jury ought to determine that. Let me go back to your answer to Judge Porter's question where he said if in the restroom there is a camera set up and the person you see say, could you hold this for me and then give it over? And you say, well, it's a silly example, but it would technically be a transfer. But silly results in a 20 additional years in federal prison for what is concededly personal use among three young women. And unfortunately, one of them dies, the one who initiated the plan. That really seems to be something that at least maybe you can win, but at least allow the jury to determine if you can win. Your Honor, I said it was a silly example when they're passing it back and forth, not when one of them then injects it and dies. That's a big difference, Your Honor. And in this case, Jennifer Wurstler couldn't. Nevertheless, the fact of the death was tragic. What we are focusing on was, was there a transfer? And we don't want to go off base by looking at an element that is irrelevant to the element we're trying to decide. And Your Honor, respectfully, there was a transfer. It was unambiguous. Emma Semler knew where to get the drugs. Emma Semler got the drugs. And Emma Semler then transferred the drugs to Jennifer Wurstler. There's no direct evidence of that. Your Honor, there is a strong inference that the jury could make that finding from based on the clear record of Dylan Quinn's testimony. And in fact, the appellant cited that in his brief. He indicated that previously the record showed that what they would do in the unambiguous testimony was that Dylan Quinn and Sarah Semler both said that the person who had the point of contact, that was the person who approached the dealer. And that's the only thing that makes sense here. Because, in fact, Emma Semler is the one who had the drugs in the bathroom. And then transferred it to Jennifer Wurstler, according to the testimony of the living eyewitness, Sarah Semler. All right. Any further questions of my colleagues? No further questions. All right. Thank you very much. We'll hear on rebuttal from Mr. Goldberger. Your Honor, may I address briefly the Robinson issue? I don't have any questions on it. If my colleagues do, they can address it. I think you've heard our comment in effect to Mr. Goldberger. I don't have any questions on that issue. Yeah, nor do I. Judge Roth? No questions. Thank you, Your Honor. You're welcome. The discussion of Figueroa really makes our point. In Figueroa, there was not a link in the chain of distribution when the narcotics officer planted the drugs on the suspect. But there was certainly a transfer of possession from one person to another. That decision is consistent with the construction of the statute that we are offering and not consistent with the policy argument that the government is conveniently offering now, but, of course, wouldn't have offered when it was prosecuting Mr. Figueroa. You know, the scenario of the importers from the Dominican Republic that Ms. Rue mentioned required that she switch grounds from our argument on joint possession to constructive possession, as you heard her say. And we disavowed in our brief that the rule with respect to joint possession would necessarily apply to a case of constructive possession. So that's not – our argument does not imply a constructive possession, an extension to constructive possession cases. What it – and in any event, those folks are going to be charged with possession with intent to distribute, not with distribution. So it's really moot in terms of the definition of possession. Those importers and wholesalers all have an intent to distribute their large quantities to users down the line at some future time. So I don't have a problem with that example at all. The issue here is not, as Ms. Rue mentioned, said at one point, and perhaps by slip of the tongue, a link in the chain of abuse, but a link in the chain of distribution. And at most, what we have here from the government is a jury argument masquerading as an appellate argument. The government has a view of the facts that they want to say is the right view. Under a proper jury instruction, if the evidence was sufficient to exclude the reasonable doubt, they could make that argument to a jury. But as Judge Ambrose suggested, that's something to tell the jury, not to tell a court of appeals. So our suggestion is that not only is the rule of law correct that we're articulating about possession, as a transfer of possession being a requirement for delivery and thus for distribution, but that the facts of record in this case really wouldn't support any reasonable, would not exclude the reasonable doubt. And so after trial, the remedy that Ms. Semler is entitled to is a remand for judgment of acquittal. But at very least, she would be entitled to a new trial. And so we respectfully request for that and all the reasons that we've articulated that the judgment be reversed. All right. Thank you very much. Do either of Judge Roth or Judge Porter, does either one of you wish to have a transcript of part of this oral argument? I don't need it. I don't think I need it. Thank you. Nor do I. Okay. Thank you very much. Thank you to both counsel for really excellently presented arguments. Thank you. Good to see you, Judge. We'll take a 10-minute recess.